T.C. Summary Opinion 2010-165

UNITED STATES TAX COURT

BERNADETTE M. SAMACO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14885-09S.                    Filed November 2, 2010.

<u>Caroline DeLisle Ciraolo</u>, for petitioner.

<u>Tyler N. Orlowski</u>, for respondent.

GOLDBERG, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.  Unless otherwise indicated, subsequent section references are to the Internal Revenue Code (Code) in

effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined deficiencies in petitioner's Federal income taxes of $2,661, $9,376, and $8,934 and section 6662(a) accuracy-related penalties for each year of $532, $1,875, and $1,787 for 2005, 2006, and 2007, respectively. After concessions,[1] the issues for decision are: (1) Whether petitioner's salary for 2005, 2006, and a portion of 2007 from the Baltimore, Maryland, City Public Schools (BCPS) is exempt from Federal income tax under the Convention With Respect to Taxes on Income, U.S.-Phil., art. 21, Oct. 1, 1976, 34 U.S.T. 1277 (article 21); (2) whether petitioner is entitled to deduct certain employment, living, and other itemized expenses that she claimed for 2005, 2006, and 2007; and (3) whether petitioner is liable for the accuracy-related penalty under section 6662(a) for each of the 3 years at issue.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are

---

[1]Respondent also determined that petitioner did not include income from Form W-2, Wage and Tax Statement, from Edison School, Inc., for 2005 or State income tax refunds and interest income in her gross income for 2006 and 2007. Petitioner did not address these issues at trial; therefore, the issues are deemed conceded. See Rule 149(b).

incorporated herein by this reference.  Petitioner resided in Maryland when she filed her petition.

Petitioner is a citizen of the Republic of the Philippines. She received a bachelor's degree in early childhood education from Miriam College.  She then attended Atenao-de-Manila, where she received a master's degree in educational administration. Both of these institutions are in the Philippines.  Petitioner began teaching in 1993.  Petitioner taught third grade at Clarett School in Kanos City, Philippines, from 1996 until she left the Philippines in 2005.

Petitioner entered the United States on June 22, 2005, arriving in Baltimore to teach for BCPS as part of an international teaching exchange program sponsored by the U.S. Department of State (the State Department).  Amity Institute (Amity) is a nonprofit organization the State Department approved to operate an exchange teacher program.  The exchange teacher program allows qualified foreign teachers to enter the United States to teach for up to 3 years.

Amity does not directly recruit teachers from the Philippines.  During 2004 and 2005 Amity worked with Badilla Corp. (Badilla), a business entity from the Philippines, and with Avenida & Associates, Inc. (Avenida), a business entity from the United States.  Badilla and Avenida are affiliated entities, and they worked together to facilitate the placement of qualified

Filipino teachers in American schools. Badilla collected background information such as transcripts and resumes from teachers in the Philippines who were interested in the exchange teacher program in the United States. Badilla found its prospective Filipino teachers principally by word of mouth and seminars conducted by its executives. Avenida or Badilla charged placement fees and additional charges to help teaching candidates with, among other tasks, finding employers in the United States and obtaining visas. In the United States, Avenida helped school districts find promising teaching candidates by providing access to a database of overseas jobseekers.

In late 2004 petitioner attended an orientation session for an exchange teacher program Avenida and Badilla sponsored. She submitted her résumé to Badilla through a personal connection. BCPS worked with Avenida to receive access to a preselected list of qualified Filipino teachers. This was the first time BCPS had recruited teachers from the Philippines. From the preselected teachers BCPS administrators chose the candidates the school system wanted to interview. In January 2005 George Duque, manager of recruitment and staffing for BCPS, traveled to the Philippines to interview petitioner and other teaching candidates. Shortly afterwards Badilla informed petitioner that BCPS would be offering her employment for the 2005-2006 school year. Petitioner received a letter from BCPS dated February 1,

2005, officially offering her employment for the 2005-2006 school year.

Generally, foreign teachers who want to teach in the United States may obtain one of two types of visas. One is the H-1B visa for working professionals. The second is the J-1 visa for individuals coming to the United States under a cultural exchange program approved by the State Department. The J-1 visa is more convenient for foreign individuals who are new teachers in the United States because the visa timing coincides with the academic year in the United States. Petitioner paid Avenida $5,200 for the following fees: A $3,200 placement fee, $725 U.S. documentation fee, a $500 J-1 visa processing fee, and $775 for airfare and travel.

Amity sponsored petitioner's J-1 visa. The State Department authorized Amity to issue Form DS-2019, Certificate of Eligibility for Exchange Visitor (J-1) Status. The form identifies the visitor; identifies the visa sponsor; briefly describes the exchange program, including the start and end dates; identifies the category of exchange; and states the estimated cost of the exchange program. The exchange teacher program cost $3,000. At all relevant times, Gertrude Hermann was Amity's executive director.

An Amity representative explained to petitioner that if she accepted the teaching offer, BCPS would be evaluating her

performance throughout the school year.  If her performance was satisfactory, BCPS would retain her for the following school year.

In a letter to petitioner dated April 11, 2005, Amity confirmed BCPS' offer.  On April 22, 2005, petitioner signed an Amity exchange teacher contract (the exchange teacher contract) with Amity and BCPS.  This contract stated that it was a "binding agreement for the length of the issued DS-2019".  Amity prepared a Form DS-2019 for petitioner's signature and mailed it to her. The length of time listed on the Form DS-2019 for petitioner's visa was 3 years, the same length as the exchange teacher program.  Petitioner signed the form and returned it to Amity for processing.

Petitioner requested and received a leave of absence from her teaching position in the Philippines for the period June 1, 2005, until the end of the school year to teach for BCPS.  Upon her arrival in Baltimore on June 22, 2005, petitioner signed a 1-year lease for an apartment at The Residences at Symphony Center. She shared an apartment with three other women, one of whom was another participant in the exchange teacher program.

During the years at issue up to the time of trial, petitioner was married and had three children.  Petitioner's family stayed in the Philippines when she moved to the United States in 2005.  Her family came to the United States in August

2006.  Petitioner's family could not join her in the United States until she received a satisfactory evaluation from BCPS. Therefore, petitioner's family could not join her until she completed her first year of teaching for BCPS.  Petitioner's husband requested and received leaves of absence from his two employers in the Philippines.  He was granted a 1-year leave of absence from his sales job and an indefinite leave of absence from his family's business.

On August 10, 2005, petitioner signed a standard Provisional Contract for Conditional or Resident Teacher Certificate Holders (BCPS employment contract), effective beginning August 24, 2005. The BCPS employment contract was for 1 year, terminating at the end of the 2005-2006 school year.  All first-year teachers who did not have full professional certification signed a similar BCPS employment contract.  BCPS assigned petitioner to teach first grade at Samuel F.B. Morse Elementary School (Morse).  On April 18, 2007, petitioner signed a regular contract with BCPS. The effective date of the contract was July 1, 2005.

The BCPS employment contract required teachers to take the Praxis I and II tests, which are part of the teacher certification process that many States require, including Maryland.  Petitioner completed the Praxis I test in 2006. Petitioner received a Maryland education certificate in 2007,

valid from July 1, 2005, through June 30, 2010.  As of trial, petitioner was scheduled to take the Praxis II test.

Soon after she began teaching at Morse petitioner began experiencing significant difficulties with student behavior and attitude.  Petitioner also sustained physical injuries when she was punched and had her hair cut by a student in her classroom. Petitioner informed her principal that she would not return to the classroom until the student was removed.  Petitioner would have left Baltimore during the 2005-2006 school year because of her "terrible experience", but she felt that she was ethically obligated to stay because she had signed a contract with BCPS.

Working in the United States provided petitioner with a salary that was considerably greater than what she had earned in the Philippines.  In the Philippines, petitioner had earned approximately 30,000 Filipino pesos a month, equivalent to $536 per month or $6,432 per year.  Petitioner's annual salary for her first year of teaching for BCPS was $37,157, which increased to $57,794 and $65,635 for her second and third years, respectively.

With respect to Federal income tax withholding, petitioner did not provide BCPS with Form 8233, Exemption From Withholding on Compensation for Independent (and Certain Dependent) Personal Services of a Nonresident Alien Individual.  Consequently, BCPS withheld Federal income tax from petitioner's salary during 2005, 2006, and 2007.

Petitioner engaged professional tax preparers to prepare her 2005, 2006, and 2007 Federal income tax returns. For all 3 years, petitioner filed Forms 1040NR, U.S. Nonresident Alien Income Tax Return. Petitioner reported that her salary from BCPS for the 2005 and 2006 calendar years and a portion of the 2007 calendar year was exempt from taxation in the United States under article 21.

Petitioner claimed itemized deductions of $9,383, $18,408, and $9,897 for 2005, 2006, and 2007, respectively. For 2005, petitioner left line 37, "Itemized deductions", on her Form 1040NR blank. However, she attached a Schedule A, Itemized Deductions, to her return reporting $9,383 of deductions. The deductions consisted of $1,645 for State income taxes, $250 for charitable contributions, $2,488 for unreimbursed employee expenses, and $5,000 for legal/documentation fees. The $18,404 deducted for 2006 consisted of $4,037 for State income taxes, $42 for local income taxes, $215 for charitable contributions, $14,064 for job search costs, and $50 for tax preparation fees. The $9,897 deducted for 2007 consisted of $4,538 for State income taxes; $499 for charitable contributions; $5,300 for tuition, travel, and dues; $181 for school supplies; and $50 for tax preparation fees. As a result of the income exclusion, income tax withholding, and deductions, petitioner requested a refund for each year 2005 through 2007.

Petitioner returned to the Philippines on July 12, 2008, after her J-1 visa expired on June 27, 2008. She applied for and obtained an H-1B visa valid from June 28, 2008, through June 30, 2010. She then returned to the United States, and as of the date of trial, she continued to be employed by BCPS.

The Internal Revenue Service (IRS) selected petitioner's 2005, 2006, and 2007 Federal income tax returns for examination. The examining agent sent three questionnaires to petitioner: Form 8784, Questionnaire - Temporary Living Expenses; Form 9210, Alien Status Questionnaire; and Form 9250, Questionnaire - Tax Treaty Benefits. Petitioner completed the forms and dated her signature October 16, 2008, on Form 9250 and October 19, 2009, on Forms 8784 and 9210. She then returned the forms to the IRS.

The Court received into evidence copies of the three questionnaires that petitioner had completed. On Form 8784 petitioner marked that her intention regarding the length of her stay in the United States changed when she received an H-1B visa. On Form 9210 petitioner wrote that June 22, 2005, was her date of initial arrival and that at that time she expected to remain in the United States until 2010. She answered the next question on Form 9210, indicating that she changed her original intention to stay in the United States because she was granted an H-1B visa.

In the notice of deficiency dated March 26, 2009, the IRS adjusted petitioner's income to include the earnings from BCPS

for 2005, 2006, and 2007 that petitioner had excluded under article 21. In addition, the IRS disallowed $7,488 of itemized deductions for 2005, consisting of $2,488 for unreimbursed employee expenses and $5,000 for legal/documentation fees. The IRS also disallowed $14,114 of itemized deductions for 2006, consisting of $14,064 for job search costs and $50 for tax preparation fees. Finally, the IRS disallowed $5,531 of itemized deductions for 2007, consisting of $5,300 for tuition, travel, and dues; $181 for school supplies; and $50 for tax preparation fees.

Respondent moved under Rule 121 for partial summary judgment concerning the issue of whether petitioner qualified in the years at issue for the exemption under article 21. Petitioner objected to the granting of the motion. The issue was fully briefed by both parties. The motion was set for hearing at trial. When the case was called for trial, the motion was heard. The parties relied on their respective positions set forth in their briefs. The motion for partial summary judgment has been denied.

The case was then tried, and the Court heard testimony from petitioner, Mr. Duque, and Ms. Hermann. The Court also received into evidence a form BCPS completed for Amity entitled "Addendum to Amity Confirmation of Employment Form 2007/2008" (the addendum). Mr. Duque signed and dated the form July 1, 2007. The addendum showed that BCPS had retained 170 of the 178 (95.5

percent) Filipino teachers in the past 2 years who had taught for BCPS through Amity's exchange teacher program.

## Discussion

### I. Income Under Article 21

Petitioner was a nonresident alien for the years at issue because of her J-1 visa status and her participation in the exchange teacher program. See sec. 7701(b). In particular, section 7701(b)(1)(B) provides that a nonresident alien is a person who is not a citizen or resident of the United States within the meaning of section 7701(b)(1)(A).[2] Generally, a nonresident alien individual engaged in trade or business within the United States is taxed on the taxable income effectively connected with that trade or business. Sec. 871(b). The phrase "trade or business within the United States" generally includes the performance of personal services within the United States at any time within the taxable year. Sec. 864(b). Compensation paid to a nonresident alien in exchange for the performance of services in the United States constitutes income that is effectively connected with the conduct of trade or business in the United States. Sec. 1.864-4(c)(6)(ii), Income Tax Regs. Consequently, petitioner's wages would ordinarily be included in

---

[2]As a teacher, petitioner is considered an exempt individual and therefore not treated as present for purposes of the substantial presence test. See sec. 7701(b)(1)(A)(ii), (3)(D)(i), (5)(A)(ii).

gross income under the Code.  Section 894(a), however, provides
that the provisions of the Code will be applied to any taxpayer
with due regard to any treaty obligations of the United States
that apply to the taxpayer.  Therefore, the treatment of
petitioner's wages might be altered by applicable treaty
provisions.  See id.

The United States is a party to an income tax convention
with the Republic of the Philippines.  The convention provides an
exemption from U.S. income taxation on income earned by Filipino
teachers teaching in the United States if the requirements of the
convention are satisfied.  Article 21 states:

Article 21<br>TEACHERS

(1) Where a resident of one of the Contracting
States is invited by the Government of the other
Contracting State, a political subdivision or local
authority thereof, or by a university or other
recognized educational institution in that other
Contracting State to come to that other Contracting
State for a period not expected to exceed 2 years for
the purpose of teaching or engaging in research, or
both, at a university or other recognized educational
institution and such resident comes to that other
Contracting State primarily for such purpose, his
income from personal services for teaching or research
at such university or educational institution shall be
exempt from tax by that other Contracting State for a
period not exceeding 2 years from the date of his
arrival in that other Contracting State.

To qualify for the exemption under article 21, a taxpayer
must meet the following requirements:  (1) The taxpayer was a
resident of the Philippines before coming to the United States;

(2) she was invited by the Government or a recognized educational institution within the United States; (3) she was invited for a period not expected to exceed 2 years; (4) the purpose of the invitation was for her to teach or engage in research at the recognized educational institution; and (5) she did in fact come to the United States primarily to carry out the purpose of the invitation. All of the requirements of article 21 must be satisfied in order for petitioner to qualify for the income exemption. The only requirement in dispute is whether petitioner's invitation to teach in the United States was "for a period not expected to exceed 2 years".

The text of article 21 does not specifically state whose expectation controls the length of the invitation to teach for a period not to exceed 2 years. Petitioner argues that her expectation as the invitee is the only expectation that matters. Respondent counters that either the expectation of the invitor, BCPS, should be decisive, or that the Court should weigh the expectations of all the parties associated with the exchange teacher program. In the light of this ambiguity in the text of article 21, we will consider all the relevant facts and circumstances, including the expectations of all the parties. See Santos v. Commissioner, 135 T.C. __, __ (2010) (slip op. at 17). We will construe the language of the treaty liberally. See N.W. Life Assurance Co. of Can. v. Commissioner, 107 T.C. 363,

378 (1996).  Then we will make an objective determination of whether petitioner was invited to the United States "for a period not expected to exceed 2 years".  See <u>Santos v. Commissioner</u>, <u>supra</u>.

A.  <u>Burden of Proof</u>

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving that the deficiency is incorrect.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Furthermore, any deductions allowed are a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to them.  Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934).

Under section 7491(a) the burden may shift to the Commissioner regarding factual matters affecting a taxpayer's liability for tax if the taxpayer produces credible evidence and meets other requirements of the section.  Petitioner moved for a burden shift under section 7491(a), contending that she produced credible evidence and met the other requirements of the section.  Respondent objected, contending that "petitioner has failed to introduce credible evidence to support her assertion that her stay in the United States was expected to last 2 years or less."  We need not, and we explicitly do not, decide which party bears the burden of proof because as discussed above, applying <u>Santos</u>

v. Commissioner, supra, we will decide this case on an objective consideration of all the relevant facts and circumstances.

B. Analysis

We begin our analysis with a discussion of the evidence that relates to petitioner's expectation. Petitioner's reliance on the two 1-year apartment leases and the 1-year BCPS employment contract is unconvincing. One-year apartment leases are commonplace and do little to indicate a tenant's long-term expectation to remain in an area.

Likewise, BCPS required all of its first-year teachers to sign what amounts to a standard 1-year employment contract. The fact that the contract did not guarantee employment beyond the first year does not mean that petitioner expected to stay in the United States for only 1 year. Amity had informed petitioner that so long as her performance was satisfactory, BCPS would retain her. When questioned on cross-examination about how she expected to perform at BCPS, petitioner responded: "I always do my best." We believe it likely that petitioner had sufficient confidence in her teaching skills to assume that her performance would be "satisfactory" and therefore she could expect that BCPS would employ her for the second and third years, and perhaps beyond. Moreover, petitioner signed what BCPS calls a "regular contract" in 2007 that put her on a track to become a tenured teacher with BCPS.

More persuasive are petitioner's own words in her answers on the three IRS questionnaires. Her answers indicate that her initial expectation was to remain in the United States for the entire length of the visa and of the 3-year exchange teacher program and that her expectation did not change until she received an H-1B visa. In response to this evidence against her, petitioner testified that she did not have any help filling out the forms and that the questions were confusing. This testimony is not credible because petitioner has a master's degree in educational administration, she speaks fluent English, and the questions on the forms are straightforward, not requiring any technical knowledge.

Furthermore, petitioner introduced no evidence that she expressed to any of the parties involved that she expected to return to the Philippines within her first 2 years in the United States. Similarly, petitioner did not testify at trial that she expected to return home within the first 2 years. Instead, she stated that she determined her expectation regarding the length of her stay on a "year-to-year" evaluation of her situation.

We also find it highly significant that despite the students' bad behavior, petitioner's physical injury, and what she described as a "terrible experience" and her feeling that "her life was threatened", petitioner remained in Baltimore teaching at Morse and as of the date of trial continued to work

for BCPS. When asked why she did not leave Baltimore during her first year teaching there, petitioner testified: "I had a contract. It was a binding contract. When you sign a contract, it is my belief that you have to finish the whole school year." Petitioner's sense of obligation to adhere to the terms of the BCPS contract could in all likelihood be applied to the contract she signed with Amity for the 3-year exchange teacher program. Petitioner knew the length of the program when she signed the exchange teacher contract. Therefore, it is reasonable to believe that she felt obligated to remain in the program for 3 years. Petitioner's actions indicate a strong commitment to staying in the United States despite the difficulties. The fact that petitioner did not renew her leave of absence for her teaching position in the Philippines, while not a decisive factor, also weighs against her argument.

In addition, we cannot ignore the financial incentive of remaining in the United States for as long as possible. Petitioner incurred more than $8,000 in expenses to participate in the exchange teacher program and to relocate herself and her family to the United States. This is not an insignificant sum in comparison to her earnings in the Philippines. Moreover, her earnings immediately grew sixfold from $6,432 to $37,157 when she moved from the Philippines to the United States. Further, her

earnings of \$65,635 in 2007, which was her third year at BCPS were, 77 percent greater than her first-year salary at BCPS.

From the perspective of BCPS, the school system certainly would not have invested so much time, money, and effort in recruiting teachers from the Philippines if it did not expect that the teachers would remain at least for the 3-year exchange teacher program. Mr. Duque likewise testified that BCPS wanted to retain the teachers it hired for as long as possible. Corroborating this testimony is the evidence from the addendum showing that BCPS retained an extremely high percentage, 95.5 percent, of the Filipino teachers it hired through the exchange program. Additionally, Ms. Hermann testified that BCPS, similar to the other school systems that hired foreign teachers through the exchange program, expected the teachers to stay for the entire 3-year program. She added that it had been Amity's experience that only a small percentage of Filipino teachers returned to the Philippines before completing the 3-year exchange teacher program and that most of participants decided to remain in the United States beyond the 3 years. The testimony of these witnesses is plausible, reliable, and persuasive.

In conclusion, after an objective examination of all of the relevant facts and circumstances, we find that petitioner and BCPS expected petitioner to stay in the United States for at least 3 years, which is greater than the "not expected to exceed

2 years" requirement of article 21.  Therefore, petitioner's income for June 2005 to June 2007, the first 2 years she was in the United States, is not exempt from Federal income tax under article 21.

## II.  Disallowed Itemized Deductions

Section 162(a) allows a deduction for ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business.  The performance of services as an employee is considered a trade or business for section 162 purposes.  Primuth v. Commissioner, 54 T.C. 374, 377 (1970).  For an expense to be necessary, it must be "appropriate and helpful" to the taxpayer's business.  Welch v. Helvering, 290 U.S. at 113-114.  An expense will be considered ordinary if it is a common or frequent occurrence in the type of business in which the taxpayer is involved.  Deputy v. du Pont, 308 U.S. 488, 495 (1940).  In order to deduct a business expense, a taxpayer must not have received reimbursement and must not have had the right to obtain reimbursement from his employer.  Orvis v. Commissioner, 788 F.2d 1406, 1408 (9th Cir. 1986), affg. T.C. Memo. 1984-533; Leamy v. Commissioner, 85 T.C. 798, 810 (1985).

### A.  2005 Disallowed Deductions--$7,488

#### 1.  Legal/Documentation Fees--$5,000

Respondent disallowed a "legal/documentation" fees deduction of $5,000.  These fees were a combination of the fees petitioner

paid to Avenida and Amity to participate in the exchange program, consisting of a $3,200 placement fee, a $725 United States documentation fee, a $500 J-1 visa processing fee, and $775 for airfare and travel.  The payment of these fees was ordinary and necessary for petitioner to teach for BCPS.  See Welch v. Helvering, supra; Deputy v. du Pont, supra.  We are satisfied that petitioner incurred fees of $5,200 in 2005.  Therefore, petitioner is entitled to a deduction in that amount.

   2. Unreimbursed Employee Business Expenses--$2,488

  Respondent also disallowed unreimbursed employee business expenses of $2,488, consisting of $1,400 for a laptop computer, $780 for school supplies, $180 for an evaluation of petitioner's teaching credentials from the Philippines, and $308 for union dues.

  Laptop computers are listed property.  Sec. 280F(d)(4).  Section 274(d) imposes strict substantiation requirements for "listed property".  To substantiate expenses for listed property, a taxpayer must show either by adequate records or by sufficient evidence corroborating the taxpayer's own statement:  (1) The amount of each separate expenditure with respect to an item of listed property; (2) the amount of each business use based on the appropriate measure and the total use of the listed property for the taxable period; (3) the date of the expenditure or use; and (4) the business purpose for an expenditure or use with respect

to any listed property.  Sec. 1.274-5T(b)(6), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).  Petitioner did not substantiate the business use of the laptop.  Therefore, we sustain respondent's disallowance of the deduction for petitioner's laptop expenses.

Petitioner deducted $780 for school supplies.  She provided a combination of store receipts and bank and credit card statements to substantiate her expenses.  A taxpayer is required to maintain records sufficient to permit verification of income and expenses.  Sec. 6001; sec. 1.6001-1(a), (e)(1), Income Tax Regs.  As a general rule, if the trial record provides sufficient evidence that the taxpayer has incurred a deductible expense but the taxpayer is unable to adequately substantiate the precise amount of the deduction to which he or she is otherwise entitled, the Court may estimate the amount of the deductible expense and allow the deduction to that extent, bearing heavily against the taxpayer whose inexactitude in substantiating the amount is of his own making. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).  However, in order for the Court to estimate the amount of an expense, the Court must have some basis upon which an estimate may be made. Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).  Without such a basis, any allowance would amount to unguided largesse. Williams v. United States, 245 F.2d 559, 560-561 (5th Cir. 1957).  The bank and credit card statements

(statements) merely list a store and an amount, with no way to verify what was purchased. Petitioner testified that all the amounts highlighted on the statements were for school supplies, and she specifically mentioned shoes for some of her students. While it is commendable that petitioner purchased shoes for low-income students, these purchases are not an ordinary or necessary expense for teaching for BCPS. See Welch v. Helvering, supra; Deputy v. du Pont, supra. Petitioner did provide receipts totaling $94 that verified school supplies purchased in 2005. We are satisfied that petitioner spent at least $94 for school supplies in 2005 and was not reimbursed by BCPS. In the light of petitioner's convincing testimony that the amounts reflected on the statements were for the purchase of school supplies, we will allow petitioner a deduction of $250 for school supplies for 2005. See sec. 62(a)(2)(D) (certain expenses of elementary and secondary school teachers are deductible to determine adjusted gross income).

Petitioner deducted $308 for union dues for 2005. Petitioner provided no evidence of membership in a union or payment of any union dues. Therefore, respondent's disallowance of petitioner's deduction for union dues is sustained.

Petitioner also claimed a $180 deduction for verification of her teaching credentials from the Philippines. She provided a check in that amount payable to Center of Applied Research. The

verification was a prerequisite to participating in the exchange teacher program and teaching for BCPS. Petitioner is entitled to a deduction of $180 as an ordinary and necessary business expense.

B. 2006 Disallowed Deductions--$14,114

1. Personal Living Expenses--$5,796

Respondent disallowed itemized deductions of $14,064, which were listed as job search expenses. A portion of the deductions, $5,796, was for rent. As a general rule, personal living expenses are nondeductible. Sec. 262; secs. 1.162-2(a), 1.262-1(b)(5), Income Tax Regs. Section 162(a)(2), however, allows a taxpayer to deduct ordinary and necessary travel expenses, including meals and lodging, paid or incurred while away from home in pursuit of a trade or business. Commissioner v. Flowers, 326 U.S. 465, 470 (1946).

The reference to "home" in section 162(a)(2) means the taxpayer's "tax home". Mitchell v. Commissioner, 74 T.C. 578, 581 (1980); Kroll v. Commissioner, 49 T.C. 557, 561-562 (1968). As a general rule, a taxpayer's tax home is in the vicinity of his principal place of employment, not where his personal residence is located, if different from his principal place of employment. Mitchell v. Commissioner, supra at 581; Kroll v. Commissioner, supra at 561-562. An exception to the general rule exists where a taxpayer accepts temporary, rather than

indefinite, employment away from his personal residence; in that case, the taxpayer's personal residence may be his tax home. Peurifoy v. Commissioner, 358 U.S. 59, 60 (1958). The purpose of the exception is to mitigate the burden of the taxpayer who must incur duplicate living expenses due to the exigencies of business. Kroll v. Commissioner, supra at 562. For purposes of section 162(a)(2), the taxpayer is not treated as being temporarily away from home if the period of employment exceeds 1 year. Sec. 162(a) (flush language).

Petitioner contends that her employment with BCPS was temporary because the BCPS employment contract she signed was for only 1 year. She contends that her tax home was in the Philippines, as that was where she resided. In other words, according to petitioner, her rent for 2006 is deductible because she expected to stay in the United States for no more than a year and thus her job was temporary.

Respondent argues that petitioner's employment at BCPS was indefinite and that Baltimore became her tax home when she moved there to teach for BCPS. For the following reasons, we agree with respondent.

Petitioner took a 1-year leave of absence from her teaching job in the Philippines when she moved to Baltimore on June 22, 2005. She began teaching at Morse for BCPS in August 2005. We have already found that petitioner intended to remain working for

BCPS in the Baltimore area for at least 3 years, which is clearly more than 1 year. Accordingly, petitioner's employment with BCPS was not temporary, Baltimore was petitioner's principal place of employment, and thus Baltimore was her tax home. Consequently, petitioner is not entitled to a deduction for her rent for 2006.

### 2. Remaining Itemized Deductions--$8,268

Regarding the remaining $8,268 of petitioner's "job expenses" that respondent disallowed, petitioner provided substantiation for a portion of the disallowed deductions. She substantiated $76 of school supplies in 2006. See sec. 62(a)(2)(D). She is, therefore, entitled to a deduction in that amount. Petitioner also substantiated that she paid $50 for fingerprinting in 2006. Being fingerprinted was required before petitioner could teach for BCPS. The fee was deferred in 2005, but petitioner provided a letter from BCPS dated May 23, 2006, requesting payment from petitioner for fingerprinting in 2005. There is a handwritten notation on the letter that the amount was paid on June 12. Petitioner testified that she paid that amount. Therefore, petitioner is entitled to a deduction of $50 in 2006 for the cost of fingerprinting.

Petitioner also paid Amity $750 in 2006, which was a portion of the exchange teacher program fee of $3,000. BCPS paid $1,500 of the fee during petitioner's first year of the program.

Petitioner was responsible for the two subsequent annual payments of $750, one made in the second year of the program and one in the third. Petitioner had to pay the fee to continue her participation in the exchange program. Petitioner did not substantiate her $750 payment in 2006, but we are satisfied that petitioner paid a fee of $750 in 2006 to maintain her standing in the program. Therefore, petitioner is entitled to a deduction of $750 for 2006.

Respondent also disallowed petitioner's $50 deduction for tax preparation fees. Petitioner testified that she used a professional tax preparer to prepare her returns. We are satisfied that petitioner paid $50 for tax preparation fees for 2006, and she is entitled to a deduction in that amount.

C.   2007 Disallowed Deductions--$5,531

Respondent disallowed itemized deductions of $5,531, which consisted of $5,300 for tuition, travel, and dues; $181 for school supplies; and $50 for tax preparation fees. Again, petitioner substantiated a small amount of the expenses for which she claimed deductions. Of the $5,300 for tuition, travel, and dues, petitioner is entitled to a $750 deduction for the third and final payment to Amity, for the reasons stated above. Petitioner is also entitled to a $50 deduction for tax preparation fees for the reasons stated above. Petitioner provided no credible evidence for the $181 of school supplies or

the remaining $4,550 for tuition, travel, and dues.  Therefore, we sustain respondent's disallowance of petitioner's deductions of $4,550 for 2007.

III.  Accuracy-Related Penalty

Taxpayers may be liable for a 20-percent penalty on the portion of an underpayment of tax attributable to negligence, disregard of rules or regulations, or a substantial understatement of income tax.  Sec. 6662(a) and (b)(1) and (2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code, and the term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  Negligence has also been defined as the failure to exercise due care or the failure to do what a reasonable person would do under the circumstances.  See Allen v. Commissioner, 92 T.C. 1, 12 (1989), affd. 925 F.2d 348, 353 (9th Cir. 1991); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  Negligence includes any failure by the taxpayer to keep adequate books and to substantiate items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.  An "understatement of income tax" is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).

The section 6662 accuracy-related penalty does not apply where the taxpayer shows that he or she acted in good faith and

exercised reasonable cause. Sec. 6664(c)(1). The determination of whether a taxpayer acted in good faith and with reasonable cause depends on the facts and circumstances of each case and includes the knowledge and experience of the taxpayer and the reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs. For a taxpayer to rely reasonably upon advice of a tax adviser, the taxpayer must, at a minimum, prove by a preponderance of the evidence that: (1) The adviser was a competent professional with sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002). Most important in this determination is the extent of the taxpayer's effort to determine the proper tax liability. Id.

The Commissioner has the burden of production under section 7491(c) with respect to the accuracy-related penalty under section 6662. To satisfy that burden, the Commissioner must produce sufficient evidence showing that it is appropriate to impose the penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Respondent has satisfied his burden by producing evidence that petitioner reported no income for 2005, 2006, and

part of 2007, failed to substantiate claimed deductions, and had substantial underpayments of income taxes for 2006 and 2007.

Nonetheless, petitioner sought the advice of a return preparer for each of her Federal income tax returns at issue. Petitioner stated that each preparer held himself or herself out as a professional.  She also stated that the preparer for 2006 was an accountant in the Philippines and an enrolled agent in the United States and that the preparer for 2007 was an accountant in the Philippines.  Finally, petitioner testified that she had "full confidence" in all of her preparers.  Respondent did not dispute the competency of either preparer.  The preparers of the returns counseled petitioner that her income was exempt from taxation in the United States under article 21.  Petitioner, having no formal training in taxation and being new to the U.S. tax system, reasonably relied upon the advice of competent tax return preparers and acted in good faith.  Therefore, we do not sustain respondent's determination that the section 6662 accuracy-related penalty applies for 2005, 2006, or 2007.

IV.  <u>Conclusion</u>

The Court has considered all arguments made in reaching our decision, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.